Elbert ROBERTS, Plaintiff,

v.

TWIN FORK COAL COMPANY, Defendant.

No. 737.

United States District Court
E. D. Kentucky,
Pikeville Division.

Oct. 14, 1963.

Harry M. Caudill, Whitesburg, Ky., Grant Knuckles, Pineville, Ky., for plaintiff.

Baird & Hays, Pikeville, Ky., for defendant.

SWINFORD, Chief Judge.

This is an action for damages and an injunction by a property owner against the lessee of the minerals underlying his land. The gist of the action is that the defendant, a mining company, is strip mining and augering coal from the land and that the attendant damage to the surface is not permitted by the mineral conveyance. The case is now before the Court on the defendant's motion to dismiss the complaint. The presentation of certain background information at this point will clarify the issues involved in the case.

This controversy has features in common with a number of cases that have been decided by the Kentucky Court of Appeals in the last seven years. See e. g. Buchanan v. Watson, 290 S.W.2d 40 (1956). The deeds severing the ownership of the minerals from the surface title were written in the 1890's. In broad terms they grant the right to remove the coal along with many other privileges respecting the use of the land designed to promote the convenience of mining. At that time, however virtually all mining was accomplished by the shaft method and the only disturbance of the surface involved was the tunnel and shaft openings, tipples and slate dumps. After World War II it became profitable to

extract the coal by stripping and augering. In these processes the soil and rock overlying the coal seam is removed and dumped down the mountainside to expose the coal. This entails complete loss of the topsoil immediately above the seam to be mined and the dumping of this quantity of overburden is highly destructive to the surface adjacent to the mine. In short, these newer mining methods greatly increase the burdens on the surface estate. The legal question is not of course whether this is generally offensive conduct but whether it is permitted by the terms of the mineral conveyances.

It is reasonably sure that the parties to the original mineral deeds in the last century did not specifically envision that the art of coal mining would develop in this direction. But the deeds are worded broadly enough to permit the implication that the parties contemplated the employment of any mining process however destructive it might be to the surface.

The Kentucky Court of Appeals has held in every case of this character that has come before it that the mineral deeds involved were written in language broad enough to support stripping and augering and all the consequences to the surface incidental to these operations. Ritchie v. Midland Mining Co., 347 S.W. 2d 548 (Ky.1961); Kodak Coal Co. v. Smith, 338 S.W.2d 699 (Ky.1960); Blue Diamond Coal Co. v. Neace, 337 S.W.2d 725 (Ky.1960); Bevander Coal Co. v. Matney, 320 S.W.2d 301 (Ky.1959); Buchanan v. Watson, supra. To the extent that there is Kentucky law on the subject, it supports the increased use of the surface land and this is the foundation of the plaintiff's federal claim. He seeks to demonstrate that by the defendant's stripping and augering on his land he is deprived of his property without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States. This constitutional claim is the only apparent basis of federal jurisdiction.

The federal courts can be aptly characterised by the limits on their jurisdiction. They cannot determine cases unless expressly warranted to do so by the Constitution or by Act of Congress. Smith v. Reeves, 178 U.S. 436, 20 S.Ct. 919, 44 L.Ed. 1140 (1900); Chisholm v. Georgia, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793). While the following is not a precise definition of federal jurisdiction thus determined, it will suffice for present purposes to state that the federal judicial power extends only to cases in which the United States is a party, to cases in which the parties are citizens of different states or to cases in which a federally granted right is at stake. Const.U.S., Art. III, Sec. 2. Since the parties have no apparent connection with the United States Government and since they are both citizens of Kentucky, if federal jurisdiction is to reach this case it must be because it involves a distinctly federal claim. The Court cannot subscribe to the plaintiff's position that his rights in this case arise under the Fourteenth Amendment due process clause.

In the very first cases that sought to define the reach of the Fourteenth Amendment, the United States Supreme Court held that its due process provisions have no relevancy to the wrongdoing of private persons but that they are solely a stricture on the conduct of state governments. Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1882); Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667 (1879); United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1875). This view has been maintained right down to the present year. Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 1133, 10 L.Ed.2d 323 (1963). Only last spring Mr. Justice Harlan in the Peterson case observed that to view the Amendment otherwise would completely appropriate to regulation by federal law all of the social and business affairs of private citizens. 373 U.S. at 250, 83 S.Ct. at 1134, 10 L.Ed.2d 323.

For all that appears from the record in the instant case, the defendant is simply a coal company in private business. It is not alleged or argued that it has a connection with the State that would make

its conduct state action and thus subject to the restrictions of the Fourteenth Amendment. Unless it is to be proved that the defendant is acting for the State either actually or colorably in stripping the coal from plaintiff's land it cannot possibly be shown that the defendant has violated the Amendment.

Plaintiff attempts to derive support for his position from the case of Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). This case held that the enforcement of a racial restrictive covenant was a violation of the Fourteenth Amendment. It was the acts of private persons that created the covenant just as it is the acts of private persons that constitute the operative facts of the instant case but it was not the private conduct that was condemned by the decision in the Shelley case. It was the use of the machinery of state government to enforce the covenant that brought the Fourteenth Amendment into the case and the opinion of the Court makes this clear:

"Since the decision of this Court in the Civil Rights Cases, * * *, the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful.

"We conclude, therefore, that the restrictive agreements standing alone cannot be regarded as violative of any rights guaranteed to petitioners by the Fourteenth Amendment. So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and the provisions of the Amendment have not been violated. * * *.

"But here there was more. These are cases in which the purposes of the agreements were secured only by judicial enforcement by state courts of the restrictive terms of the agreements." Ibid. 334 U.S. at 13, 68 S.Ct. at 842, 92 L.Ed. 1161.

The Court went on to demonstrate how private conduct could be constituted state action by judicial vindication.

■ It cannot be shown by similar reasoning that the State has entered into the case at bar. The mere fact that the defendant finds comfort in the Kentucky decisions condoning strip mining in particular cases having no connection with the present controversy does not make the State an active participant in this case. Shelley v. Kraemer does not even intimate that state involvement in a particular transaction may be found in the fact that a state court decision in a similar but unrelated transaction has, by force of precedent, the power to determine the legal consequences. The petitioners in the federal phase of Shelley v. Kraemer were complaining of action by a state court in a case to which they were parties and which was specifically aimed at them. Here the plaintiff has never been directly subjected to action by the Kentucky courts and his position is accordingly so dissimilar to that of the petitioners in Shelley that analogy between the two cases is imperceptible.

To hold otherwise would be to view the State an active participant in any private conduct that has consequences under the State common law and thus to subject it to evaluation by the federal courts according to its compliance with the Fourteenth Amendment.

Apart from the apparent absence of state action in this case, there is a less elaborate reason why this Court cannot find a violation of the Fourteenth Amendment. If state involvement could be predicated on the fact that the state fosters a certain common law policy, it is not certain that this would be such a case. The Kentucky courts have shown a tendency to enlarge the material burdens on the surface estate of land subject to outstanding mineral rights but it cannot be said that they have ever decided a case similar to this one in all pertinent features. In all of the Kentucky strip

mining cases the mineral conveyances have contained waivers of damages to the surface. There is nothing in the record of this case to indicate that such a waiver was made by the plaintiff's predecessors in title. This would very likely distinguish this case from any heretofore decided by the Kentucky courts. In Buchanan v. Watson, supra, the language of the court fairly justifies such an expectation:

"The validity and enforceability of a waiver of damages have been recognized as well as that of such grants of mining rights just discussed. The only qualification imposed in exercising these rights with respect to any given situation is that in order to be relieved of liability for damages, the rights must not be exercised arbitrarily, wantonly, or maliciously." 290 S.W.2d at 43.

The significance of the waiver of damages to the result in Buchanan v. Watson and the other strip mining cases was further emphasized by Judge Stewart in Wiser Oil Co. v. Conley, 346 S.W.2d 718 (Ky.1961) in response to the oil company's argument that the use of a certain method of oil extraction at the expense of great damage to the surface could be justified by Buchanan v. Watson:

"We do not agree. There is a vital difference between the terms and conditions of the mineral deed involved in the Buchanan case and the language embraced in the oil and gas lease under consideration here. The mineral deed contained an express waiver of damages which this Court stated was sufficiently broad to prohibit a recovery for any destruction from strip mining that might result to the surface. The waiver of damages condition was the controlling feature in the Buchanan case. On the other hand, the oil and gas lease has no such waiver provision and, furthermore, we do not believe such a provision can be read into it. There is no decision by this Court which might indicate what it would do where, as here, there is a virtual destruction of the surface, as well as considerable injury to the coal seam, by a new system of oil withdrawal where the owner or lessee of the oil and gas rights has no waiver of damages to rely upon." 346 S.W.2d at 721.

If the Court of Appeals is now uncertain as to how a strip mining case would be decided in the absence of a waiver of damages, the question can only be less clear to this Court. Inasmuch as all of the plaintiff's reasoning is directed at showing that Kentucky law deprives him of his property without due process, the uncertainty as to how his case would be decided under Kentucky law is fatal to his position. Until a case that is similar to this one has been decided by the Court of Appeals no one can say that there is Kentucky law on the precise subject, let alone that it deprives the plaintiff of his property. For the present the Court cannot conclude that the plaintiff has been injured in any right afforded him by the Constitution of the United States. This failing, there is no discernible basis for federal jurisdiction in this case.

■ The Court can make no expression concerning the merits of plaintiff's claim without jurisdiction of the case. However it might sympathize with the plight of this landowner and however fully it might appreciate the consequences of the practices involved here in relation to the policies of this State and the United States directed at the preservation of our natural resources, material and aesthetic, the Court must remain silent in the absence of a clear demonstration that it has jurisdiction over the case. That the courts should confine themselves to the jurisdiction that has been ordained to them is a matter that transcends any other consideration that may be involved in this case. Matthews v. Rodgers, 284 U.S. 521, 52 S.Ct. 217, 76 L.Ed. 447 (1932).

An order will be entered this day sustaining the motion of the defendant to dismiss the complaint.