UNITED STATES of America, Plaintiff,

v.

The STEARNS COMPANY, Defendant.

Civ. A. Nos. 78–62, 78–169.

United States District Court,
E.D. Kentucky,
London Division.

Oct. 9, 1984.

MEMORANDUM

SILER, Chief Judge.

In 1937, Stearns Coal and Lumber Company, now known as The Stearns Company ("Stearns") conveyed by deed to the United States 46,842.4 acres of land in several tracts in Wayne and McCreary Counties in Kentucky, reserving certain mineral rights. This land was purchased by the United States under the Weeks Act of 1911, as amended by the Clarke-McNary Act of 1924, as part of the Cumberland National Forest (now the Daniel Boone National Forest).

No efforts were made by Stearns to strip mine this property until some date before July 30, 1954, when it made an application with the Secretary of Agriculture to strip mine under the reservation of mineral rights in the deed of conveyance. That was denied on July 22, 1955, after a hearing before a citizens' Committee of Consultants on the issue of whether it would be in the public interest, but not on the question of whether there was a legal right to mine under the provisions of the deed.

Stearns made no further efforts to strip mine within the national forest until 1976 when it sought to strip mine a nineteen acre tract of land partially within the Daniel Boone National Forest. This was again denied by the Forest Service because: (1) Stearns did not have a legal right to strip mine under its mineral reservation from the deed; and (2) the Surface Mining Control and Reclamation Act of 1977 prohibited such activity on national forest land. After Stearns received a state permit to mine the coal, it brought this suit in May, 1978, for declaratory and other relief that it had the right to strip mine coal within the national forest under its mineral reservation. Subsequently, in November, 1978, the United States brought suit against Stearns for declaratory relief that Stearns did not retain the right under the deed to strip mine coal under the property conveyed. These cases were consolidated for trial and ultimate decisions.

Louis DeFalaise, U.S. Atty., Jane Graham, Marilyn Daniel, Asst. U.S. Atty., Lexington, Ky., for plaintiff.

Ben Fowler, William H. Gorin, Frankfort, Ky., for defendant.

The study for, and eventual purchase of, the Cumberland National Forest in the late 1920's and into 1930 did not include the Stearns land, as Stearns was not interested in the sale of its property. However, as the depression years arrived, Stearns was having problems making a profit in its timber and underground coal mining operations. As a matter of fact, it was losing money in its mining operations. Stearns then sought the sale of the realty to the United States. Negotiations were formalized in October, 1935, and the deed which is the subject of this litigation was executed on December 18, 1937. The sales price for the surface rights to the government was $135,500.84, or $2.85 per acre.

The language in the deed was unambiguous, as asserted by all parties, but it is silent on the question of strip mining. Some pertinent provisions of this very lengthy deed are:

RESERVING, however, from the operation of this conveyance, unto the party of the first part [Stearns], its successors or assigns, the unrestricted use and control for all legal purposes until same are abandoned or surrendered by vendor, or its assigns, of approximately forty (40) acres, ... at the mouth of each of the following mines: # 1, # 4, # 11, # 15 and # 16, Cooperative, Fidelity and Grassy Fork. These reserved areas include mine openings, tipples, trucks, bridges, substation and shops.

*      *      *      *      *      *

There is, also, RESERVED, the right to the use of all existing or necessary rights-of-way over the land conveyed herein for the removal of timber hereinafter reserved, and the right to use existing rights-of-way, and other rights-of-way as approved by the Forest Officer, over the land herein conveyed for the removal of any timber now or hereafter owned by the Stearns Coal and Lumber Company.

*      *      *      *      *      *

There is, also, RESERVED, all metaliferous minerals, coal, oil, gas and limestone in, upon and under the described tracts of land; PROVIDED, however, that all operations for mining and removing same same (sic) shall be done and carried on in accordance with the following rules and regulations prescribed by the Secretary of Agriculture, viz:

*      *      *      *      *      *

2. In prospecting for, and in mining and removing minerals, oil, or gas, and in manufacturing the products, thereof, only so much of the surface shall be occupied, used or disturbed as in (sic) reasonable and, according to recognized good practice, necessary for the purpose.

*      *      *      *      *      *

5. The method commonly known as "Hydraulic Mining" is positively prohibited.

6. Payment at the usual rates charged in the locality for sales of National Forest timber, and timber products of the same kind or species, shall be made to the United States for all timber, undergrowth or young growth, cut, destroyed, or damaged in prospecting, mining, drilling, or removing minerals, oil, or gas, or in manufacturing products therefrom, and in the location and construction of buildings or works of any kind for use in connection therewith.... No timber, undergrowth, or reproduction shall be unnecessarily cut, destroyed, or damaged.

Other provisions of the deed provide that every person desiring to prospect for minerals or to mine must exhibit written evidence of the right to mine on the property, all structures for mining have to be approved by the forest officer, and those buildings and structures are to be removed after the mining is completed. Stearns was also responsible for cleaning up after mining operations and for any fires directly or indirectly caused by its activities.

Stearns' short-term timbering potential on the tracts in the deed had virtually been exhausted, and it was shutting down its mining operations at several locations, when the deed was signed. Although there was knowledge at that time regarding strip

or surface mining, Stearns only employed underground mining. Very little surface mining had been conducted in the counties wherein these tracts lay and in adjacent counties, and this type of strip mining had been a very crude type of operation and relatively unprofitable. No surface mining was in existence in this area at the time of the deed, although there had been some in the vicinity of Lily in Laurel County and Silerville (now Strunk) in McCreary County. Both had been discontinued long before this conveyance.

There also had been strip mining in other distant areas, such as western Kentucky, Ohio and Illinois, before 1937, but the topography of the land conveyed in the 1937 deed was quite different from those areas where stripping had gone on, and the Stearns land was not suitable for any strip mining methods which had been conducted prior to 1937, as there was too much overburden and the slopes too steep for commercially feasible and efficient extraction of the coal. All of the prior strip mining had been conducted on relatively flat land, using mechanical shovels or drag lines with much less overburden than was found in these tracts of land.

The purpose of the purchase and the policy of the United States in acquiring the national forest land were for timber production and the protection of navigable waters and environs. There was then no recreational or park policy for the national forests.

During negotiations for the sale of the surface rights, there was no mention, written or oral, between the parties, involving strip mining,[1] except for the proviso prohibiting hydraulic mining, which is a type of very destructive surface mining, using water instead of a machine. In areas such as Ohio where the United States acquired surface rights for the national forests, it took

chances that the land would never be strip mined, although that later came about. However, in the sale and acquisition of the property here, it was never the intention of the parties that the mineral owner's (Stearns') rights to use the surface in the removal of the minerals would be superior to any competing right of the surface owner (United States). They certainly did not contemplate or envision that these tracts would be mined by stripping or augering, and it was not so provided in the deed or in any other correspondence between the parties before the deed was signed.

By agreement of the parties, Kentucky law is applicable. Since the time of the trial, the Kentucky General Assembly has passed a new statute, KRS 381.940, which provides:

> In any instrument heretofore or hereafter executed purporting to sever the surface and mineral estates or to grant a mineral estate or to grant a right to extract minerals, which fails to state or describe in express and specific terms the method of coal extraction to be employed, or where said instrument contains language subordinating the surface estate to the mineral estate, it shall be held, in the absence of clear and convincing evidence to the contrary, that the intention of the parties to the instrument was that the coal be extracted only by the method or methods of commercial coal extraction commonly known to be in use in Kentucky in the area affected at the time the instrument was executed, and that the mineral estate be dominant to the surface estate only for the purposes of coal extraction by the method or methods of commercial coal extraction commonly known to be in use in Kentucky in the area affected at the time the instrument was executed.

---

1. There was evidence that H.C. Gillis, a late law partner of this Judge's father, told William A. Kinne, one of Stearns' negotiators on the deed, that strip mining would be allowed under the deed, as it only prohibited hydraulic mining. This appears to be hearsay, but it probably is admissible under Rule 803(3), Federal Rules of

Evidence, to prove the intent of Stearns through its lawyer. Nevertheless, the Court does not give much weight to that statement, not because it doubts the credibility of N.B. Perkins, the witness who overheard the conversation, but because the statement does not coincide with other evidence concerning intent.

■ This new law appears to be dispositive of this case, if it is constitutional, for there are no express or specific terms in the deed pertaining to the method of coal extraction to be used. Thus, as there is no clear and convincing evidence to the contrary, the Court must hold that the intention of the parties was that the coal was to be extracted only by the methods commonly used in the area affected at the time the instrument was executed, and the mineral estate was dominant to the surface estate *only* for the commonly known methods of commercial coal extraction, that is, for underground mining. Although there was some slight history of surface pit mining, there was no history of strip mining that would be considered commonly known to be used in the area for commercial coal extraction. Thus, under the statute, the claim of Stearns must fail.

Nevertheless, as the statute might later be found to be invalid, the Court will make further conclusions on the law as developed prior to 1984.

In 1956, the Kentucky Court of Appeals held in *Buchanan v. Watson,* 290 S.W.2d 40, 43 (Ky.1956), that under the "broad-form" or Mayo deed (named for John C.C. Mayo, the man who got rich in Kentucky from obtaining mining leases in the early part of the century) conveying minerals, the owner of the mineral rights:

> has the paramount right to the use of the surface in the prosecution of its business for any purpose of necessity or convenience, unless this power is exercised oppressively, arbitrarily, wantonly, or maliciously, in which event the surface owner may recover for damages so occasioned.

It also held that even where the parties had not contemplated a particular type of mining (strip or auger), where the deed was silent on the method of extraction, it did not preclude the mineral holder from utilizing the only feasible method of extracting the coal. *Id.* The decision was not new law; it just applied old principles to a new factual situation. *See Blue Diamond Coal Co. v. Neace,* 337 S.W.2d 725 (Ky.1960);

*but see Commerce Union Bank v. Kinkade,* 540 S.W.2d 861, 864 (Ky.1976) (Stephenson, J., concurring).

That maxim from *Buchanan* was upheld for years up to the present. *See, e.g., Martin v. Kentucky Oak Mining Co.,* 429 S.W.2d 395 (Ky.1968). The latter decision, responding to many briefs from environmental groups on the question, said, "[C]onversation is not in issue," *id.* at 397, as states such as Pennsylvania and West Virginia, which do not recognize rights to strip and auger mines for holders of minerals under "broad-form" deeds, still allow strip and auger mining. It also followed *Buchanan v. Watson, supra,* when it stated at 397:

> Whether or not the parties actually contemplated or envisioned strip or auger mining is not important—the question is whether they intended that the mineral owner's rights to use the surface in removal of the minerals would be superior to any competing right of the surface owner.

■ On the other hand, the parties agree that the deed here is not a "broad-form" deed but is more narrowly written. In construing a deed, if there is no ambiguity in it, it will be strictly enforced according to its terms. If there is any ambiguity, it will be construed most strongly against the grantor, "both upon the grant of the property and the rights and privileges specified," *Buchanan v. Watson, supra* at 43, quoting from *McIntire v. Marian Coal Co.,* 190 Ky. 342, 227 S.W. 298, 299 (1921). (In that case, the grantor conveyed the minerals. In this case, the grantor conveyed the surface rights.)

■ Nevertheless, even when the grantor conveys the surface rights, if its reservation of minerals is broad enough, it may strip or auger coal upon the land, *see Croley v. Round Mountain Coal Co.,* 374 S.W.2d 852 (Ky.1964), especially when the mineral reservation includes stone, water and all minerals and the grant was made when strip mining was quite common. *See Peabody Coal Co. v. Pasco,* 452 F.2d 1126, 1131 n. 3 (6th Cir.1971). Although Stearns

makes much of the language in the deed that it reserved "all metaliferous metals, coal, oil, gas and limestone *in, upon and under* the ... land (emphasis added)," as that seemed to be a factor in *Croley v. Round Mountain Coal Co., supra,* nevertheless, in *Peabody Coal Co. v. Pasco, supra* at 1131–1132, it was held, in analyzing Kentucky law, that such a phrase was not dispositive of the case, but was, like the words, "necessary or convenient," from *Buchanan,* evidence of the intent of the parties as to which estate (mineral or surface) would be superior. In *Pasco* the 1919 deed was held to preclude strip and auger mining, but a 1914 deed allowed it. In viewing the language from those deeds, it is obvious that the language in the Stearns deed does not follow either. The language in the Stearns deed was not so broad as the 1914 deed which included a waiver of damages to the surface and allowed all rights and privileges in and about the land on the surface or underneath the surface incident to and required by successful and profitable mining. *See also Peabody Coal Co. v. Erwin,* 453 F.2d 398 (6th Cir.1971). The *Erwin* analysis was followed in *Commerce Union Bank v. Kinkade, supra* at 864, as the court held that the language in a mineral deed did not allow strip mining.

One additional point needs to be discussed. Stearns has argued that when the deed specifically prohibited hydraulic mining, by following the maxim of *expressio unius est exclusio alterius,* the intent of the parties was to allow any other form of mining by failing to exclude it specifically. Although the maxim may be used in certain instances, as stated in *Ford v. United States,* 273 U.S. 593, 611, 47 S.Ct. 531, 71 L.Ed. 793 (1927), it:

> properly applies only when in the natural association of ideas in the mind of the reader that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference that that which is omitted must be intended to have opposite and contrary treatment.

That court went on to quote Lord Justice Lopes from *Colquhoun v. Brooks,* 21 Q.B.D. 52, 65, that:

> It is often a valuable servant, but a dangerous master to follow in the construction of statutes or documents. The *exclusio* is often the result of inadvertence or accident, and the maxim ought not to be applied, when its application, having regard to the subject-matter to which it is to be applied, leads to inconsistency or injustice.

*Ford v. United States, supra* at 612, 47 S.Ct. at 537; *cf. Durnin v. Allentown Federal Savings and Loan Ass'n,* 218 F.Supp. 716, 719 (E.D.Pa.1963).

In the case at bar, it is quite evident that the parties never discussed mining other than hydraulic methods, so the omission of other methods in the deed has no value in the construction of the instrument.

No ruling is being made on which party has the burden of proof, as that is not a factor in this decision. Both parties have presented proof and the Court has found for the United States by a preponderance of the evidence.

Therefore, as the Court finds from all the language in the deed that the parties did not intend that Stearns would have superior rights to extract the minerals over the surface rights of the government, *cf. Greenwood Land & Mining Co. v. Bergland,* London Civ. No. 78–626 (E.D.Ky. Oct. 23, 1978) (unpublished opinion by Moynahan, C.J.), *appeal pending; United States v. Polino,* 131 F.Supp. 772 (N.D.W.Va.1955) (West Virginia law), the Court declares the surface rights of the United States in the deed involved are superior to the mineral rights of Stearns, so Stearns cannot engage in surface mining on the property listed in the deed involved without approval from the United States.